LITTLE ROCK & FT. SMITH RAILWAY CO. v. OPPENHEIMER.

Opinion delivered October 2, 1897.

RAILROAD—DISCRIMINATION AGAINST LOCALITY—PENALTY.—A railroad company does not incur the penalty for making an unjust or undue discrimination in facilities for transportation of freight, under Sand. & H. Dig., §§ 6301, 6312, where it fails to provide equal facilities for the shipment of goods from two different localities, if the conditions and circumstances surrounding the two localities are materially different, as where one of the localities enjoys the advantage over the other of being a terminal and jobbing station, and also a competing point for other railroads.*

Appeal from Conway Circuit Court.

JEREMIAH G. WALLACE, Judge.

*Dodge & Johnson*, for appellants.

Mere delay is not discrimination; all discrimination is not forbidden, only such as is unjust or undue. The act should

─────────────

*NOTE.—It is provided by Sand. & H. Dig., §§ 6193-4, that railroad companies shall be liable to damages for failure to furnish sufficient accommodations for the transportation of freight.— REP.

be construed strictly. L. R. 22 Q. B. 642 (C.S..40 A. & E. R. Cas. 64); 9 A. & E. R. Cas. 126; *id.* 207; 4 S. W. 875; 2 Ker. 245; 14 Wend. 215; 40 Mo. 491; 46 Mass. 458; 32 Vt. 559; 6 Duer, 376; 5 Hun, 562; 1 L. R. C. P. 385; 12 Conn. 410; Hutch. Carriers (2 Ed.) §§ 114–115; 20 Wis. 894; 2 Shower, 127; 5 Bing. 217; 51 Mo. 311; 10 Biss. 170; 12 N. Y. 245; 20 Wis. 594; 102 N. Y. 590; 22 A. & E. R. Cas. 421; 16 ·Fla. 623 (26 A. R. 737); 40 A. &. E. R. Cas. 57; Hutch. Carr. § 302; 110 U. S. 507.

*A. S. McKennon,* for appellees.

The question of discrimination was fairly submitted to the jury, and the evidence sustained the verdict. 24 S. W. 1002; 8 Am. & Eng. Enc. Law, pp. 954–958.

*R. J. White* and *Carmichael & Seawel* (*on motion for rehearing*), for appellees,

The English "Railway and Canal Traffic" Act is similar to our statute, and it omits the word "locality;" yet it has been held to include localities as well as individuals. 27 A. & E. R. Cas. 22; 4 Ry. & Can. Traf. Cases, p. 1; 1 Ry. & C. T.Cases, 63, 109, 116 and 155; *ib.* 121, 143; 1 Ry. & C. T. C. 202; 7 *ib.* 184, 190; 4 *ib.* 291. Our statute being modeled after the English act, we adopt the construction placed on it, along with the act. 51 Ark. 534; 60 Ark. 288, 110 U. S. 628; S. C. 29 A. &. E. R. Cas. p. 59, and note. The effect of American decisions construing statutes similar to ours is to extend this application to localities. 149 U. S. 680; 63 Tex. 322; 67 Ill. 10; 71 Wis. 372; 3 Interstate Com. Com. Rep. 594; 35 A. & E. Ry. Cas. 519; 4 Elliott, Railroads, § 1467; 1 Wood, Railways, § 195. Intent of defendants to be inferred from their acts. 2 Ry. & C. T. Cases, 73; 9 A. & E. R. Cas. 123; 162 U. S. 219; 1 Wood, Railways, § 198; 4 Ell. Railroads, § 1477; 7 R. & C. T. Cas. 184.

BATTLE, J. This action was instituted under an act entitled "An act to prevent unjust discrimination, * * * and to prevent discrimination between transportation companies and individuals in furnishing cars or motive power," and approved March 24, 1887, for the purpose of collecting a penalty. The

plaintiffs recovered a verdict, and a judgment thereon, against the defendants, for the sum of fifteen hundred dollars.

The basis of the action was the failure of appellant to furnish the same facilities for transporting cotton from Altus (the shipping station for Roseville) as were furnished at Van Buren. This, it was insisted, was an undue and unjust discrimination in favor of the shippers at Van Buren against the appellees. The important facts are undisputed, and are substantially as follows. The cotton crop of 1891 was unusually large. In Arkansas it exceeded anticipation, and was 100,000 bales larger than the preceding crop. The weather favoring, it was rapidly gathered and hurried to the railroads for transportation to market. The railroad companies were not prepared to ship it at many stations as rapidly as it was offered for shipment. At these stations it soon filled their platforms, after which they refused to receive more until room for it was made by the shipment of that already received. At Roseville, where the appellant had established a receiving station for freight to be shipped at Altus over their road, the platforms were covered with it, and appellant was unable to ship it for many days, because it did not have cars sufficient to meet the demands for transportation upon their road. During the months of October, November and December of that year (1891) appellees hauled to Roseville several hundred bales of cotton to be shipped at Altus over appellant's road, and tendered them to its agent, and he refused to receive them, giving as his reason for so doing that the station platform at Altus was filled, and he had no room to store or care for it. This cotton lay at Roseville several days awaiting transportation. At Van Buren, a town on appellant's road, however, cotton was promptly shipped. The facilities there for shipping were greater than at any other place on the road except at Little Rock. This was owing to the fact that there are several roads running to that town, called the Kansas & Arkansas Valley Railway, the St. Louis & San Francisco, the Greenwood branch of the St. Louis, Iron Mountain & Southern Railway, and appellant's railway, the two roads first mentioned competing with the last; and to the fact that appellant proportionately furnished more cars at that place than at others.

The reason more cars were used at Van Buren in proportion to freight shipped than were furnished by appellant to other stations or depots was, it is at one of the termini of their road; and another was, there were wholesale merchants at Van Buren, who shipped goods there by the car load, and thereby caused many cars to be unloaded at that town. Being a terminal point, many empty cars necessarily accumulated there. In such cases it was the duty and custom of the agent at the terminals to use as many of the cars as were needed there, and to report the remainder to the transportation department for distribution.

The statute upon which this action is based (Act March 24, 1887), is as follows:

"Sec. 1. All individuals, associations and corporations shall have equal rights to have persons and property transported over railroads in this state, and no unjust or undue discrimination shall be made in charges for, or in facilities for, transportation of freight or passengers within the state," etc.

"Sec. 4. No discrimination in charges or facilities for transportation shall be made between transportation companies and individuals, or in favor of either by abatement, drawback, or otherwise, and no railroad, or any lessee, manager or employee thereof, shall make any preferences in furnishing cars or motive power," etc.

"Sec. 12. That any railroad corporation that shall violate the first, fourth,   *   *   *   sections of this act.   *   *   * shall forfeit and pay for every such offense any sum not less than fifty dollars nor exceeding one thousand dollars and costs of suit, to be recovered by civil action by the party aggrieved, in any court having jurisdiction thereof," etc.

The only parties this act declares shall have equal rights to have persons and property transported over railroads in this state are individuals, associations and corporations. Having declared that they are entitled to these rights, it further declares that "no unjust or undue discrimination shall be made in charges for, or in facilities for, transportation of freight or passengers." Against whom is this discrimination prohibited? Manifestly, those the act declares are entitled to equal rights. If it meant that it shall not be made against any party, without

regard to those named, the first clause would be entirely superfluous. Having declared who are entitled to equal rights, it follows that the refusal to them of the same rights allowed to others would be a discrimination. Hence the act forbids unjust or undue discrimination against them in the transportation of persons or property, and imposes a penalty upon any railroad company who shall be guilty of the forbidden act.

Appellees sued for the penalty on account of a discrimination against them as an association,—as a partnership. Are they entitled to it?

The act makes no changes in the common law to the rights of the parties named therein to equal facilities for shipping, or as to unjust discrimination. At common law it was the duty of the common carrier to receive and carry all goods offered for transportation upon receiving a reasonable hire; and every one had equal rights to transportation by them. Yet, under this rule, different facilities furnished under circumstances essentially different did not constitute an unjust or undue discrimination, when the difference was in accordance with the difference in circumstances, and the difference was not intended to injure another shipper, or give, or did not tend to give, the favored shipper material advantages over him in their competition in business. The observance of this rule accomplished the design and object of the law in prohibiting discrimination, which was to prevent common carriers from favoring one shipper to the injury of another in the same business, from suppressing or dimishing competition, and from creating monopoly. *Hays* v. *Pennsylvania Co.*, 12 Fed. Rep. 309; *Samuels* v. *Louisville & N. R. Co.*, 31 Fed. Rep. 57; *Messenger* v. *Pennsylvania Railroad Co.*, 36 N. J. L. 410; *Phipps* v. *London & N. W. R. Co.*, 50 Am. &. Eng. R. Cases, 497; Hutchinson on Carriers, § 302; 1 Wood, Railways, §§ 197, 198; 4 Elliott, Railroads, § 1676.

Was there any unjust or undue discrimination by appellants against appellees? Superior facilities for shipping were furnished at Van Buren. If this was a discrimination, it was not against any particular individual or association, nor against the shippers at any particular station, but against the shippers collectively at every station on the railroad except at Van Buren; that is to say, in favor of one locality against all others. They furnished the same

shipping facilities to all persons, associations and corporations at Van Buren which they refused to all parties at other stations. Hence there was no discrimination against individuals or associations, they being treated alike under the same circumstances.

There was no intention to injure appellees by discrimination. The facilities furnished at Van Buren in the months of October, November and December of 1891 were no greater than those furnished in previous years. The evidence does not show that a sufficient number of cars were not furnished at all the stations on the road prior to the fall and winter of 1891. Previous to that time Van Buren had enjoyed the same facilities as it did then, by reason of it being one of the terminals of the railroad, and the same distribution of cars was made. The complaint of unjust discrimination grew out of the unusually large cotton crop of 1891. Sufficient transportation was not furnished then because appellants had not anticipated it.

In the months of October, November and December of 1891 appellees were merchandising at Paris, in Logan county, and were not injured by reason of advantages gained, through superior facilities for shipping, by those engaged in the same business. If they suffered, their competitors suffered in like manner. All were treated alike, and suffered in the same manner.

It follows that there was no unjust or undue discrimination against appellees, and that they are not entitled to a penalty.

Judgment of the circuit court is reversed, and final judgment is rendered here in favor of appellant.

BUNN, C. J., and RIDDICK, J., concur.

WOOD, J., (dissenting.) Necessarily, under the construction given the act by the court, there could be no discrimination between individuals at different stations. So long as all the individuals at any given station are treated alike, there can be no discrimination between these and the individuals at some other station, although at the one station all facilities desired or required are furnished while at the other they are wholly denied. This, in our opinion, was not the intention of the legislature, and such a construction is not justified

by the language of the act. There is nothing in the act limiting the discrimination to individuals of the same station, and, without some such restrictive words in the act itself, we can find no authority for so limiting it. The legislature evidently intended to prevent any *undue or unjust* discrimination between "individuals, associations and corporations" anywhere in the state, whether shipping from the same or from different stations. If the construction of the court be correct, any railroad in the state may *arbitrarily* furnish shipping facilities to one station and withhold all facilities from another rival station similarly situated, without being subject to the penalties of the act. (When we speak of place or station, we mean the individuals, associations or corporations, as the case may be, shipping from said place or station. For the abstract *thing* called the "station" or "locality" makes no shipments, and has no commercial or financial life, apart from the individuals, etc., residing and doing business there.)

It is manifest that the exercise of such absolute power upon the part of railway corporations would be disastrous to the business prosperity of the individuals so discriminated against at any given station. Nor can it be denied that ofttimes the most powerful incentives exist for these corporations to make such discriminations. For instance, they may own little property at one station, and have large possessions at another and rival business point, and it may be to their interest to destroy the town where they have little in order to build up the place where they have much. In what more effectual way could this be done than by denying transportation facilities to the one while furnishing to the other. Again, at one station on their road there may be competing lines, while at another, and, may be, its commercial rival, there are none. Now, to meet the competition at the one station, and to do it with the least expense possible, they may take away from the other station, where there is no competition, all or nearly all its facilities for transportation, in order to furnish to the station where there is competition. Can it be said that there would be no discrimination in cases of this kind, under the act? or that a discrimination based upon such considerations as these, alone, would not be undue and unjust? We think

not. Doubtless to prevent just such acts of discrimination as these, and all others, between individuals, etc., shipping from different stations, as well as acts of undue and unjust discrimination between individuals, etc., shipping from the same station, the act under consideration was passed.

The supreme court of Illinois, in speaking of a case where there had been a discrimination in freights between individuals at different stations, used this pertinent language: "The discrimination in such a case is as much a discrimination between individuals as it would be in reference to two persons living in the same locality and shipping at the same station, unless, as before stated, a satisfactory reason can be given for discrimination between the points of shipment." And further: "So, too, in the case before us. The resident of Bloomington, who sends to Chicago for a car of lumber, is charged by the company at the rate of $5.00 per thousand feet for transportation. The resident of Lexington, who orders the same lumber at the same time, is charged five dollars and sixty-five cents per thousand feet for transportation sixteen miles less in distance. Is there not here, unless an explanation can be furnished by the company, an unjust discrimination between individuals, quite as much within the prohibition of the principles of the common law as would be an unjust discrimination between individuals of the same town." And the court held that the fact of there being a *competing line of road* at the station where the individual lived in whose favor the discrimination was made would not be a sufficient explanation. *Chicago & A. R. Co.* v. *People*, 67 Ill. 11. Precisely the same principle would apply whether the act of discrimination were in the matter of freight charges or facilities of transportation.

The act under consideration is: "All individuals, associations and corporations shall have equal rights to have persons and property transported over railroads in this state, and no unjust or undue discrimination shall be made in charges for, or in facilities for, transportation of freight or passengers within the state," etc. There are no terms of limitation as to locality except "within the state" (and, of course, the legislature had no power to legislate beyond the state). The restrictive words as to the discrimination are that it shall not be "*unjust or*

*undue.*" The use of these terms ("unjust or undue") shows that the legislature knew that there would be, necessarily, some discrimination, but that it was only such as was *"unjust or undue"* that was inhibited.

Section 6193, Sand. & H. Dig., makes it the duty of railroads to "furnish sufficient accommodations for the transportation of all such passengers and property as shall, within a reasonable time previous thereto, offer or be offered for transportation at the place of starting and junctions of other railroads, and at sidings and stopping places established for receiving and discharging way-passengers and freights, and shall take, transport, and discharge such passengers and property at, from and to such places on the due payment of tolls, freight or fare legally authorized therefor." The next section provides "that the railroad shall pay to the party aggrieved all damages sustained by reason of a violation of this act, with costs of suit." See § 6194, Sand. & H. Dig.

The statute prohibiting unjust discrimination, *supra*, furnishes an additional remedy to the statutes just quoted, by way of penalty against those coming within its terms. All these statutes are but declaratory of the common law, which makes it the duty of common carriers to furnish facilities for and to transport all goods offered in the ordinary course of business; and to prohibit any unjust and undue discrimination in furnishing such facilities of transportation. 4 Elliott, Railroads, § 1467, and authorities cited in note; 1 Wood, Railways, § 195. "It is," says Judge Elliott, "safe to say that the rule is that a railroad carrier, so far as concerns the receipt and transportation of goods, however it may be as to the rates of freight, must, where the conditions and circumstances are identical, treat all shippers alike. It cannot furnish facilities to some shippers, and deny them to other shippers, unless there is a difference in condition or circumstances such as makes the discrimination a just one." 4 Elliott, Railroads, § 1468.

A common carrier, for such goods as he undertakes to carry, is bound to provide reasonable facilities of transportation to all shippers at every station who, in the regular and expected course of business, offer their goods for transportation. The carrier is not required to provide in advance for any unpre-

cedented and unexpected rush of business, and therefore will be excused for delay in shipping or even in receiving goods for shipment until such emergency can in the regular and usual course of business be removed. Elliott, Railroads, § 1470; Hutchinson, Car., § 292.

The Supreme Court of Wisconsin voices our opinion of the duty of railroads to distribute cars at different stations as follows: "The company owes the same duty to shippers at any one station as it does to the shippers at any other station of the same business importance. The rights of all shippers applying for such cars, under the same circumstances, are necessarily equal; no one station, much less any one shipper, has the right to command the entire resources of the company to the exclusion or prejudice of other stations and other shippers. Most of such suitable cars must necessarily be scattered along and upon (the company's) different lines of railroad, loaded or unloaded. Many will necessarily be at the larger centers of trade. The conditions of the market are not always the same, but are liable to fluctuations, and may be such as to create a great demand for such cars upon one or more of such lines, and very little upon others. Such cars should be distributed along the different lines of road, *and the several stations on each, as near as may be in proportion to the ordinary business requirements at the time*, in order that shipments may be made with reasonable celerity.   *   *   It is the extent of such business ordinarily done on a particular line, or at a *particular* station, which properly measures the carrier's obligation to furnish such transportation. But it is not the duty of such carrier to discriminate in favor of the business of one station to the prejudice and injury of the business of another station of the same importance." *Ayers* v. *N. W. Ry. Co.*, 71 Wis. 372. In *Rice* v. *Railroad Co.*, 3 Interstate Com. Rep. 594, Walker, Commissioner, said: "It is the duty of a common carrier to provide adequate equipment for the business of his line; if in time of special pressure some one must wait, *the annoyance must be distributed with all possible equality.*" Again, "A common carrier is under obligation to serve the public equally and justly; it is unlawful for him to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation or locality." True, this

was said under the interstate commerce act expressly naming locality; but, under the construction we give the act before us, it is equally applicable to the case in hand. See also Hutch. Carriers, § 297; 1 Wood, Railways, § 195.

The statute seeks to enforce equality of treatment to all shippers under like circumstances. As we have seen, not every act of discrimination is unlawful. But there is always a presumption against it. It devolves upon the shipper, in the first instance, to show the discrimination, and then the burden is upon the railroad to show circumstances that would justify or excuse it, *i. e.*, to show that the discrimination is just. 1 Wood, Railways, § 198; 4 Elliott, Railroads, § 1477.

The statute does not define what is *unjust* or *undue* discrimination. The Supreme Court of the United States in *Texas & P. R. Co.* v. *Interstate Com. Com.*, 162 U. S. 219, says that "such questions are questions, not of law, but of fact." But we agree with Judge Elliott that this can only be so in a loose sense, and that "in strict accuracy, it is a question in which the elements of law and fact are component parts." 4 Elliott, Railroads, § 1697. As was said by the Supreme Court of Texas: "It is a question of law and fact in the given case, and whether the discrimination be or not unlawful must be ascertained by applying to the facts of the case the principles of the common law," since, as we have shown, our statute is but declaratory of the common law. *Houston & T. C. R. Co.* v. *Dinkins*, 9 A. & E. R. Cases, 126. Whether there has been a discrimination undue or unjust in any case depends upon the situation and circumstances of both the shipper and carrier, and is generally a question for the jury under proper instructions.

So far as the shipper is concerned, the relation or situation of one shipper towards the railroad is the same as that of any other shipper having the same class of goods to ship, although they may be at different stations. For example, the merchant at one station having one hundred bales of cotton ready, and which has been offered for transportation, is in the same relation or situation to the railroad as a merchant at some other station, who has the same quantity and quality of cotton ready for shipment. Both are alike desiring and are entitled to prompt transportation and to equal facilities. But the relation of the railroad

company to each of these shippers may be very different.    For instance, one station may be the end of a division—a distributing point for cars; may have commission merchants shipping goods by the car load; or at the one station there may be an unprecedented rush of business.  These circumstances of the railroad company existing at the one station and absent at the other may enable the railroad to ship promptly for the shipper at the one while denying it to the shipper at the other.    Here would be a discrimination, but no reasonable man could say it would be unjust or undue.    But, if it should turn out that there was no unexpected rush of business at the one station that did not exist at the other; that the demand for transportation for cotton was about the same at both stations; but that at the station where the favored shipper lived there was a competing line of road, and that the cars which accumulated there (on account of its being a distributing point and on account of large shipments by commission merchants) were held there, and not distributed to the other station *pro rata*, in order that the railroad might be able at all times to meet the competition, and to control the business of shipping cotton,—if there was testimony to justify a conclusion of this kind, a verdict against the railroad for unjust or andue discrimination could not be disturbed.    There was evidence upon which the jury might have reached this conclusion.  The foregoing principles of law are applicable to cases of the kind under consideration.    We have not closely scrutinized the instructions, to see whether they conform to our views of the law as above set forth, since the opinion of the court makes a reversal inevitable in any event.    Assuming, however, that the directions to the jury are in accord with the views we have expressed, the judgment of the court should be affirmed.

HUGHES, J., concurs in the dissent.

### OPINION ON MOTION FOR REHEARING.

Filed November 20, 1897.

RIDDICK, J.    We held in a former opinion in this case that a shipper at Altus, a station on appellant's railway, could not recover a penalty against the railway company because it furnished to shippers at Van Buren, another station on its line, facilities superior to those furnished at Altus.

We did not hold, nor was it necessary to hold, that the laws of this state do not forbid railroad companies from making unjust discrimination between different localities along their line; but we did hold that, under the facts of this case, appellees were not entitled to a penalty, and that their remedy for the wrongful failure of the company to furnish adequate facilities at Altus was an action for damages.

Learned counsel for appellees, in this and other cases in which the same questions are involved, have favored us with able and elaborate printed arguments in support of the motion to rehear, but, after giving such arguments careful consideration, our conclusions announced in the former opinion remain unchanged, and the motion must be overruled. As the question determined is important, and as there is division among the judges of the court, I will endeavor to give some further reasons for our judgment, in addition to those stated by Mr. Justice Battle in the former opinion. The facts are fully stated in that opinion, and I will only briefly refer to them again.

The crop of cotton raised along the line of appellant's railway in 1892 was unusually large. The appellant company furnished sufficient cars at Van Buren and Little Rock, where there were competing lines and superior advantages for shipment, to carry all cotton offered, but at Altus and other intermediate points, where there were no competing lines, it failed, during the months of November and December of that year, to furnish cars sufficient to ship cotton as fast as it was offered, and there was delay in shipping cotton offered by appellees and other shippers at those stations. The contention is that it was an unjust discrimination, within the meaning of our penal statute, for the company to furnish a sufficient number of cars to carry all cotton offered at Van Buren, when not enough cars were furnished at Altus.

Now, we do not deny that if the appellant company wrongfully failed to furnish sufficient cars to carry cotton of appellees offered for shipment, it became liable to said shippers for all damages suffered in consequence of the failure to furnish cars. Not only our statute (Sand. & H. Dig., § 6193), but the common law, fully covers a case of that kind, and appellees have already, in another action, recovered a judgment against the

appellant company for a large amount to compensate them for all damages suffered by reason of the delay in shipment complained of here, and that judgment has been affirmed by this court. But the mere fact that the company has wrongfully failed to furnish cars to appellees does not necessarily entitle them to a penalty in addition to their damages. To justify the court in awarding them a penalty, they must bring their case within the strict letter of the law affixing the penalty. *Hawkins* v. *Taylor*, 56 Ark. 45; 2 Elliott, Railroads, § 710.

The statute under which the penalty is claimed in this case provides that "all individuals, associations and corporations shall have equal rights to have persons and property transported over railroads in this state, and no unjust or undue discrimination shall be made in charges for or in facilities for transportation of freight or passengers within the state." (§ 1, Act March 24, 1887). And again in another section it provides that "no discrimination in charges or facilities for transportation shall be made between transportation companies and individuals, or in favor of either, by abatement, drawback or otherwise, and no railroad, or any lessee, manager, or employee thereof shall make any preferences in furnishing cars or motive power. (§ 4, *ib.*)

The punishment provided for violation of the above provisions is a penalty of not less than $50 nor more than $1,000 for each offense, to be recovered by the party aggrieved in a civil action.

Now, the rule at common law, as stated by a recent writer, is that a railroad carrier, so far as concerns the receipt and transportation of goods, must, where the conditions and circumstances are identical, treat all shippers alike, but there is no requirement to furnish the same facilities where conditions and circumstances are essentially different. 4 Elliott, Railroads, § 1468. There is nothing in the language of the statue above quoted that expressly says that railway companies shall furnish the same facilities to different localities, or that they shall furnish the same facilities to different individuals, unless they are demanded under similar circumstances. But another clause of the first section of the act above referred to does refer to localities by providing that "persons and property transported over any

railroad shall be delivered at any station at charges not exceeding the charges for transportation of persons and property of the same class in the same direction to any more distant station." It will be noticed that the portion of the statute which mentions localities has reference to overcharges in the transportation of passengers and freight, and not to discriminations in the matter of facilities.

The fact that stations are mentioned in the clause referring to overcharges, and not mentioned in the clause in which discrimination in facilities for transportation is condemned, seems to indicate that the legislature recognized that it was impracticable to regulate the facilities furnished at one town by a comparison with those furnished at another, where the conditions and circumstances might be altogether different.

It is doubtless true that a railway company should so distribute its cars as to give adequate transportation facilities to the different stations along its line, and if, by reason of a neglect to properly distribute its cars, it wrongfully fails to furnish shippers at any station adequate transportation facilities, it must respond in damages to the party injured; but we deny that every such shipper is entitled to a penalty, in addition to his damages. We do not believe that the legislature intended that this penal statute should apply in such a case, for it would be utterly impossible to distribute the cars of a large railway so as to give each station its exact proportion. But, if the construction contended for is correct, the railroad company would have to furnish not only a proportional number of cars, but cars of the same kind, drawn by engines of the same speed. A fast through train is a great facility in the transportation of both passengers and freight. The railroads of the state have for years run fast trains, which stop only at certain stations selected by the company. If the contention of appellees is correct, that the intention of this act was to prohibit and punish discriminations as to facilities in transportation between different localities, it is not easy to see why this is not an unjust discrimination which subjects the company to a penalty in favor of every person who is prevented from riding upon a fast train, or from shipping his fruit or other products upon it, by reason of its failure to stop at his station. Certainly, under our view of this statute, which is that it forbids and

punishes favoritism between passengers or shippers, if the company should permit certain persons to ride upon or ship property upon its fast train, and deny the use of such train to other persons who offered themselves as passengers at the same station, and under the same circumstances, it would become liable to a penalty. If this be true, and if it be also true, as counsel contend, that it makes no difference at what station the passenger offers himself for passage or his property for shipment, he is still, under this statute, entitled to like facilities, then it necessarily follows that the company must stop its fast trains at every station at which a passenger offers, or incur a heavy penalty, whether that station be a great city or a side track in the swamp. Of course, if such trains were compelled to stop at every station, they would cease to be fast trains, and the result would be not only a great inconvenience to the people of the state, but a heavy loss to the railroads of the state; for, under such a restrictive law, the railroads of this state would be utterly unable to compete for the through traffic, and the competing lines of railway which pass around the state would carry such traffic, both freight and passenger.

But cars and trains are not the only facilities within the meaning of this act. A depot, a house for freight, or a waiting room for passengers, is a facility for the transportation of passengers and freight, within the meaning of this statute. If a railway company should at one of its stations permit the use of its depot, yard, pen or other stational facility to one shipper, and refuse them to other shippers, under the same conditions and circumstances, I think there could be no doubt that it would become liable for a penalty; for the object of the statute was to prevent favoritism,—in other words, to prevent discrimination in facilities between passengers or shippers when demanded under like conditions and circumstances. Along the railways of this state are depots, both old and new, in different stages of repair, and there are flag stations without a depot or station house of any kind. If the construction contended for is correct, why is this not a discrimination? But under that construction it would be hazardous for a railway company to make any decided improvement in this respect at one of its stations that it did not at once repeat at every other station.

Again, it is necessary for the company to keep at certain stations along its line a telegraph operator on duty during the night to send dispatches in regard to the movement of its trains. At such stations it is usual to keep the depot open during the night for the convenience of the patrons of the road. Under our construction of this statute, the company must in this respect treat all alike, and cannot allow the use of its depot or station house to one passenger or shipper after night, and refuse it to others who apply for it under like circumstances. But, under the broad construction contended for here, that this statute was intended to prevent and punish discriminations in facilities between different stations, if the company kept its depot open at night for the reception of freight or passengers at one station, it would have to furnish like facilities to passengers and shippers at all other stations, or subject itself to an action for a penalty in favor of each passenger or shipper denied the use of a depot during such hours. The company would thus be compelled to close the depots at all stations to avoid incurring penalties for discrimination.

It would of course be absurd to suppose that the legislature intended that railway companies should furnish to way stations and small villages facilities the same or equal to those furnished to cities and larger towns, for this would deny to such towns and cities the legitimate advantages due to different circumstances and conditions.

But, if we say that the intention was to compel the railroad company to furnish proportional facilities to each station, then it would follow that the legislature intended that the railway company in furnishing such facilities should exercise its judgment as to what were proportional facilities. It would be a difficult matter to determine the dimensions and size of depots, the quality and quantity of train service, and other facilities to be furnished to the different towns and villages of the state, differing, as they do, in size and commercial importance, so as to make their facilities proportional to those furnished other towns and cities of the state. But, under the construction contended for, if the company erred in this matter, however honestly, it would at once become liable, not only for one penalty, but probably for hundreds of them. As it is not usual

to inflict penalties for mere errors of judgment, this should incline the court to adopt a different construction from that contended for.

From these and other reasons, it can, I think, be seen that the construction contended for by appellees that the word "locality" should be read in the statute, so as to make it a penal offense for a railway company to furnish passengers or shippers at one locality facilities not furnished to all other stations along its line, would necessarily result in great embarrassment to railway companies. It would cast upon the courts for decision many difficult questions as to what were proportional facilities, and what were not; for the courts would, in effect, be discharging the duties of a board of railroad commissioners, without any discretion whatever to relieve against the hardships of the statute.

The ingenious answer to these objections is in effect that the court need not consider such difficulties seriously, for they would be questions for the jury. And that is true. If the construction contended for by appellees is correct, then whether the failure to stop a fast train at a certain station, or whether the failure to furnish a depot as good as some other on the line, or to keep it open during the same hours,—whether these and other matters were unjust discriminations would, indeed, be a question for the jury. A passenger desiring to recover the penalty pronounced by the statute (fifty to one thousand dollars) would naturally ask himself whether the depot at which he was compelled to wait was as commodious as that at some other station, or whether the train upon which he rode was as superb and elegant in its appointments and as convenient in its time schedules as the fast passenger that stopped only at larger towns. As most people are not disposed to underestimate the importance of their own town or village, it would be easy for him to conclude that the company was unjustly discriminating against himself and his town. As the question might be answered differently by different persons, it can be seen that such a construction would open up a rich field of litigation. If not satisfied with one law suit, the passenger could return the next day, and suffer the same inconveniences, and obtain another cause of action. Every man could have his own law suit, and one for each member of his family.

Now, while the people of this country are not unduly prone to litigation, still the records show that they do not hesitate to appeal to the courts when they believe their rights to be invaded. But the remarkable fact in connection with this statute, if the construction contended for by appellees be correct, is that, although there are similar statutes in other states, learned counsel, as I shall presently attempt to show, have not been able to produce a single reported case of this kind,—a case where, under a statute like this, a plaintiff has demanded a penalty of a railroad company for failing to furnish him the facilities it furnished to shippers at another and different station. I do not say that this shows that the construction they contend for is incorrect, but I do say that when we consider the great diversity in the facilities furnished to different towns and stations and the frequent complaints made against railways on account of defective train service and facilities,—that, considering these things, the fact that, so far as we can ascertain from the reports, no one has heretofore brought such an action is conclusive proof that the construction contended for by appellees is not the construction usually placed upon this statute. It shows that the language of the statute does not plainly express what appellees say it means. But this is a penal statute, and cannot be extended by implication. "The rigid rules of the common law with reference to the liability of carriers should not," says Judge Elliott, quoting the language of the supreme court of North Carolina, "be applied in cases involving the violation of a penal statute." (2 Elliott, Railroads, § 710.) The statute should not of course be defeated by a forced or overstrict construction, but the intention of the legislature must be gathered from the words, and they "must be such as to leave no reasonable doubt upon the subject." *United States* v. *Hartwell*, 6 Wall. 385; *Whitehead* v. *Railroad Co.*, 87 N. C. 255; *Dwyer* v. *Gulf, etc., R. Co.*, 23 Am. & Eng. R. Cases, 654; *Hawkins* v. *Taylor*, 56 Ark. 45.

Following this well settled rule, the supreme court of Iowa held that a statute of that state against railway discriminations did not include the failure to furnish cars, because, as stated by the court, the statute was penal, and could not be extended by implication. The court pointed out in that case, as we have in

this, that the plaintiff had a clear remedy by an action for dam-ages, but that did not include a penalty. *Bond* v. *Wabash, etc., R. Co.,* 67 Iowa, 712; S. C. 23 Am. & Eng. R. Cases, 608.

And so the supreme court of Texas, declining to apply a penal statute in a case against a railway company not clearly within its meaning, said that it could not award a penalty in any case not expressly denounced by the act. "To do so," said the court, "would be judicial legislation of the most reprehen-sible character." *Dwyer* v. *Gulf, etc., R. Co.,* 23 Am. & Eng. R. Cases, 654.

Let us now, for a moment, consider the character of the act of which the appellant company was guilty. On account of a rush of cotton to market, it was unable, during two months, to carry promptly all cotton delivered at stations between Lit-tle Rock and Van Buren. Now, admitting that the company, by the use of due care and foresight, might have foreseen this accumulation of freight, and have guarded against it by provid-ing sufficient cars to carry it, still it must be admitted that there was no intention or desire to injure Altus or any other station. The company, taking the worst view against it possi-ble under the evidence, had but negligently failed to supply itself with sufficient cars to handle the increased business, and when the rush came it endeavored to avoid injury to itself by carry-ing first the freight offered at points where there were competing lines, and after that the freight from the other stations. The wrong was not in furnishing sufficient cars to Van Buren and Little Rock, for this its duty required it to do, but in failing to furnish sufficient cars to Altus and other intermediate points. The failure to furnish cars brought the company squarely within the scope of another statute (Sand. & H. Dig., § 6193) under which it has been compelled to respond in damages. Appellees are not now asking for compensation, but for a penalty, and they must stand upon the strict letter of the law. Now, as was stated by Mr. Justice Battle in his opinion, if there was a discrimination against appellees, within the meaning of this statute, there was a discrimination against every shipper who offered cotton or other freight at any station between Van Buren and Little Rock during the months of November and Decem-ber, 1892. More than that,—for every separate offer of cotton

or other freight and failure to carry was under the statute a separate offense. Under such construction, the aggregate amount of the penalties for which the company became liable during those two months would be simply stupendous.

When asked to adopt a construction that, in addition to compensatory damages, visits such severe punishment for an act of mere negligence, I recall to mind the words of a distinguished English judge, who, speaking of an action brought against a railway company under the Railway and Canal Traffic Act of England, said, very extensive powers are conferred upon the court by this act,—"powers which may be exercised for the benefit of the public, but which may be also exercised to the wrong and detriment of persons carrying on a great trade; and we ought, therefore, to be very cautious to ascertain that there is reasonable ground for believing that the act has been infringed before we interfere." Cresswell, J., in *Caterham Ry. Co.* v. *London, B. & S. C. and S. E. R. Co.*, 1 Ry. & Canal Traffic Cases, 34. But if it was proper to exercise caution in the the application of a remedial statute, which inflicted no penalty, and was administered under a board of commissioners with large discretionary powers, how much more necessary is it to do so in construing an unbending penal act, against the punishment of which no tribunal has power to relieve. The construction of the act contended for here is far-reaching. To adopt it would be to change the statute from a simple and easily understood law to a very complex one, difficult either to understand or obey. It would be certain to subject railway companies to heavy penalties in many cases in which they were guilty of no intentional wrong. It is not called for by the language of the act itself, nor included within the plain meaning of the legislature. We cannot, therefore, adopt it without violating what we conceive to be fundamental rules regarding the construction of penal acts.

I will now briefly notice some of the cases which counsel for appellees have cited in support of their views. First, they refer to certain decisions of the federal courts under the interstate commerce act, and to decisions of the English courts under the railway and canal act of England. It is sufficient to say of those cases that the acts which they construe are neither of them penal, but are remedial acts, and therefore to be construed

liberally, to advance the remedy.  The most hasty examination of those acts will show that they are altogether different from the one under consideration.  Not only is the language of the acts different, but those acts are enforced under the supervision of a board of commissioners with discretionary powers to relieve special hardships imposed by the letter of the law. No railroad company under those acts becomes liable for a penalty unless for disobedience of an order of the court after the discrimination has been adjudged and pointed out.  The shipper, under these acts, recovers only his actual damages, and the usual relief granted is not even a judgment for damages, but an order that the railway company in future refrain from such discrimination.  It is evident, therefore, that a much broader construction can properly be given these statutes than the one we have under consideration.  If, in construing a highly penal act, we undertake to follow the decisions under those statutes, we shall inevitably be led into the grossest and most inexcusable errors.  This is sufficient to dispose of those cases, but, if it were necessary to go further, it could be shown that the reasoning of those cases, instead of opposing, tends strongly to support the conclusions at which we have arrived.

I will next notice the cases of *Chicago & A. R. Co.* v. *People*, 67 Ill. 11, and the case of *Ayers* v. *N. W. Ry. Co.*, 71 Wis. 372.  I call special attention to these two cases, not only because they are cited by counsel for appellees, but because they are extensively quoted in the dissenting opinion delivered by my two learned associates. The Illinois case, *supra*, was for discrimination in freights.  The company made a greater charge for freight from Chicago to Lexington than it did from Chicago to Bloomington, a more distant station on the same line, the freight being of the same kind and being hauled in the same direction. The case came within the words of a statute similar to our own, to the effect that persons and property transported over any railroad shall be delivered at any station at charges not exceeding the charges for transportation of persons and property of the same class in the same direction to a more distant station.  The judge who delivered the opinion said something about discrimination between localities, but he was speaking of discrimination in freights.  He had no reference to discrimination in facil-

ities, and to suppose that he referred to a case of the kind we have here would be altogether misleading.  It must also be noticed that, after discussing discriminations to a considerable extent, he concluded by giving judgment in favor of the company, for the reason that the statute upon which the prosecution was based was void.  We are unable to understand how that decision can be considered as in conflict with our decision here.

The Wisconsin case (*Ayers* v. *N. W. Ry. Co.*, 71 Wis. 372) was an action, not for a penalty, but for damages for wrongfully failing to furnish cars to carry freight.  We fully agree with the judgment of the court in that case, but it was unnecessary for counsel to go so far to cite a decision on that point. Only a few months ago this court affirmed a judgment against appellant in favor of appellee for damages for failing to furnish cars, in which exactly the same question was involved as that determined by the Wisconsin court.  We felt so little doubt about the law of the case that it was disposed of by an oral opinion.  Appellees knew of the case, as it was in their favor, and they might just as well have cited it as the case from Wisconsin, although we are not able to see that either case has any bearing upon the question here.  In the Wisconsin opinion, as well as that from Illinois, there are expressions which might mislead if you disregard entirely the facts of the case, and suppose the judge to be discussing the law as applied to the facts of this case; but, to get at the meaning of an opinion, you must, of course, consider the language of the judge as referring to the facts of the case before him, and not to an altogether different state of facts.

The next and last case that I shall notice will be a case from the supreme court of the United States, *Union Pacific Railway* v. *Goodridge*, 149 U. S. 680.  The case arose under a Colorado statute, and was a prosecution for an overcharge in freights. Counsel say that both the statute and case are similar to those before us.  There is some similarity in the two statutes, but little between the two cases.  The Colorado statute is a much more comprehensive act than our act.  It provided, among other things, that railway companies should keep posted schedules of their rates, and that, while such schedules were in force, no rebate or drawback therefrom should be allowed one shipper, unless the same was open

and allowed to all persons alike, except in special cases, where the approval of the railroad commissioners was procured in writing. The evidence in the case showed that there were two rival coal companies, one owning a mine at Erie, and the other at Marshall, these places being stations upon lines of the defendant's railway, and each place about the same distance from Denver, to which place the two companies shipped their coal. The railway company posted a schedule of rates showing that the charges on coal from both Erie and Marshall was one dollar per ton. In other words, the railway company's schedule showed that the rate to Denver on coal was the same from both places, but it made a secret agreement with the Marshall company by which it allowed it a rebate of 40 cents on the ton, and this was done without the written consent of the commissioners. These facts brought the case clearly within the express language of the act, and the company was held guilty. The judge, in speaking in that case of discriminations between localities, had reference to discriminations in charges of the kind forbidden by the act, and not to discrimination as to facilities.

I have now noticed the cases upon which counsel for appellees seem to place most reliance, and in my opinion none of them furnish authority for holding the company liable for a penalty for a discrimination in facilities between different localities, much less between localities where the conditions and circumstances are widely different, as we find them here. Van Buren has competing lines of railway. It is the end of a division of appellant's railway. It is a much larger town than Altus, and has not only a much larger retail business, but has several wholesale houses. These and other advantages which Altus does not possess cause empty cars to accumulate at Van Buren, which are used in the shipment of cotton from that point. Conceding that the statute was intended to punish discriminations between different localities, it could not apply to a case such as this, where the conditions and circumstances surrounding the two localities are altogether different; and this is the ground on which, as I understand it, rests the opinion of Mr. Justice Battle ordering a dismissal in this case. But it seems plain to me that the purpose of this act, so far as it forbids discrimination in facilities for transportation, was to require the

railroad company to treat all shippers alike who ship from the same place and under the same conditions, and to forbid and punish favoritism on the part of the company under such circumstances. It has, in my opinion, no application to discrimination in facilities when furnished at different localities; for that is covered by another statute, and the common law, which require railway companies to furnish reasonable and adequate facilities for transportation at every station, and provide a remedy for any failure in this respect by means of an action for damages. Sand. & H. Dig., § 6193; 4 Elliott, Railroads, § 1479.

For these reasons I adhere to the decision made in this case. The motion to rehear is overruled.

BUNN, C. J., and BATTLE, J., concurred in the conclusion that the motion to rehear should, under the facts of this case, be overruled.

WOOD, J., (dissenting). The Railway and Canal Traffic Act of England, passed in 1854, provides: "Every railway company, etc., shall, according to their respective powers, afford all reasonable facilities for receiving and forwarding and delivering traffic upon and from the several railways, etc., belonging to such companies, etc. And no such company shall make or give any undue or unreasonable preference or advantage to or in favor of any particular person or company, or any particular description of traffic, in any respect whatsoever; nor shall any such company subject any particular person or company, etc., to any undue or unreasonable prejudice or disadvantage in any respect whatsoever." Sec. 2, ch. 31, 17 and 18 Vict. See 27 Am. & Eng. R. Cases, appendix, p. 22. State legislation upon this subject has in all salient features followed this English statute. 5 Am. & Eng. Enc. Law, 178. Our statute ( § 6301, Sand. & H. Dig.), like the English act, in naming the objects protected against discrimination, does not mention "locality."

In *Vahlberg* v. *Keaton*, 51 Ark. 534, the court, through Judge Hemingway, in speaking of a statute modeled after an English statute, said: "As the American states have adopted the English statute as a model, so the American courts have adopted the construction given it by the English courts."

*Bank of Newport* v. *Cook*, 60 Ark. 288; *McDonald* v. *Hovey*, 110 U. S. Rep. 619.

In *Richardson* v. *Midland Ry. Co.*, 4 Ry. & Canal Traffic Canal Cases, 1, upon a complaint by two firms at Newark that their traffic was unduly prejudiced by the railway company, by not being carried on as favorable terms as to rates and in other respects as Barton traffic, the court said: "It is not contended on the part of the railway company that it is any answer to a complaint of inequality of charge that the traffic favored and the traffic prejudiced are not in the same locality; and, assuming that there is a competition of interests, and that circumstances in other respects are not dissimilar, the traffic of two localities, both on the same system of railway, but it may be at a distance from each other (and Newark is 40 miles distant from Burton), is as much within the traffic act of 1854 as the traffic of two or more individuals in the same locality is." *Citing and quoting the earlier cases of Ransome v. The Eastern Counties Ry. Co., 1 Ry. & Canal Traffic Cases, p. 63, and Nicholson v. Great Western Ry. Company, 1 id. 121; see, also, Town of Newry v. Ry. Co., 7 Ry. & Canal Cases, 184; Gerard v. Ry., 4 Ry. & Canal Traffic Cases, 291.* There is nothing in the railway and traffic act as to freight rates, etc., between different localities.

Nor was the Act of 1873 (36 and 37 Vict, c. 48), providing for commissioners for the better enforcing the Railway and Traffic Act, passed until long after the earlier of the above cases were decided. The case of *Richardson* v. *Midland Ry. Co., supra,* although decided after the passage of the act of 1873, as we have seen, distinctly approved the construction given the Railway and Canal Traffic Act by the earlier cases. It thus appears that the English courts construe the Railway and Canal Traffic Act as applying to acts of undue and unreasonable discrimination between shippers of different localities; otherwise they would not have enforced it in such cases. But localities are not mentioned. Our statute is modeled after this act. Therefore, upon the authority of *Vahlberg* v. *Keaton*, and *Bank* v. *Cook, supra,* the same construction should be given the act under consideration as was given the Railway and Canal Traffic Act by the English courts.

But this is also the construction of the supreme court of the United States. The constitution of Colorado provides: "All individuals, associations and corporations shall have equal rights to have persons and property transported over any railroad in this state, and no undue or unreasonable discrimination shall be made in charges for or in facilities for transportation of freight or passengers within the state." This is the identical language of the statute under consideration. First paragraph, § 6301, Sand. & H. Dig. An act of the legislature of Colorado provided: " No railroad corporation shall charge, demand or receive from any person, company or corporation for the transportation of persons or property, or for any other service, a greater sum than it shall, etc., charge, demand or receive from any other person, company or corporation for a like service from the same place, or upon like conditions and under similar circumstances, and all concessions of rates, drawbacks and contracts for special rates shall be open to, and allowed all persons, etc., alike at the same rate per ton per mile, upon like conditions, and under similar circumstances." An action was instituted by G. and M., coal merchants at Erie, and selling coal at Denver, against the railroad to recover triple damages, under the statute, for unjust discrimination in freights for coal from Erie to Denver, and in favor of the town of Marshall, which was two miles further from Denver than the town of Erie. The rates from the two places to Denver were the same. Mr. Justice Brown, speaking for the court, said: "This act was intended to apply to intrastate traffic the same wholesome rules and regulations which congress two years thereafter applied to commerce between the states, and to cut up by the roots the entire system of rebates and discrimination in favor of particular localities, special enterprises, or favored corporations, and to put all shippers on an absolute equality. * * * It is bound to deal fairly with the public, to extend to them reasonable facilities for the transportation of their persons and property, and to put all its patrons upon an absolute equality." *Union Pac. R. Co.* v. *Goodridge*, 149 U. S. 680. The Colorado statute was highly penal, the railroad being subject to a forfeiture of "three times the actual damage sustained by the party aggrieved." Yet this was not deemed by the Supreme Court of the United States as any reason why the

statute and the constitutional provision should not be enforced.

It will be observed that the Colorado statute quoted above says: "*For a like service from the same place,*" just what is decided in effect by the majority opinion is the meaning of our statute. But the Supreme Court of the United States, construing it in connection with the provision of the Colorado constitution exactly like our statute, enforced it as between individuals of different localities, showing clearly that the provision of the Colorado constitution embraced acts of discrimination between individuals of different localities, and was intended, like our act, to protect the parties named therein against all acts of "undue or unjust discrimination within the state." And, although Erie and Marshall were different stations or localities, shippers there were treated, for the purpose of the Colorado constitution and statute preventing unjust discrimination, as being in like condition and under similar circumstances with reference to the railway company in shipments of coal. The fact of shippers being at different stations or localities does not necessarily make their condition or circumstances unlike in relation to the railroad company, as we have shown.

In the opinion of the court first announced it is said: "Was there any unjust or undue discrimination by appellants against appellee? Superior facilities for shipping were furnished at Van Buren. If this was a discrimination, it was not against any particular individual or association, nor against the shippers at any particular station, but against the shippers collectively at every station on the railroad except Van Buren—that is to say, in favor of one locality against all others. They furnished the same shipping facilities to all persons, associations and corporations at Van Buren which they refused to all parties at other stations. Hence there was no discrimination against individuals or associations, they being treated alike under the same circumstances. It appears from this, as well as the opinion just delivered, that the court holds that where shippers are at different stations or localities, there can be no undue or unjust discrimination between them. In other words, where the locality of shippers is not the same, there is such a difference in circumstances as to justify the discrimination in failing to furnish facilities, however great

or unreasonable the difference might be.   We are not concerned therefore about the discussion of the facts of this particular case, as it is conceded that Van Buren and Altus are different stations, which, upon the doctrine announced by the court, must work a reversal and dismissal of this cause.   It might be said, however, with reference to the facts, that the station agent at Van Buren, when asked the following question, to-wit: "It mattered not how much they needed them (the cars) down there [at Altus], you were going to keep enough for your people?" Replied: "That was about the size of it." This would tend to show that the competition of another road at Van Buren was the real cause of the cars being kept .there, and not distributed to other points along the road where there was no competition.   At any rate, this, in connection with all the other facts and circumstances, was sufficient to require the submission of the question of undue or unjust discrimination to the jury upon proper instructions.

We do not join issue with much that is said in the able opinion just rendered by Judge Riddick.   The opinion we have already delivered shows that.   We cannot consent that this statute should not be enforced because another remedy by way of damages for failing to furnish transportation facilities is provided for the party aggrieved.   The legislature, of course, was familiar with our constitutional provision preventing discrimination.   Const. 1874, art. 17, § 3.   Also with the statute passed in 1868 (§ 6193, Sand. & H. Dig.) requiring railroads to furnish sufficient accommodations for the transportation of passengers and property.   This act was in obedience to the constitutional provision, and in harmony with the prior statute, and was intended as an additional or cumulative remedy.   It is said in the last opinion that the "appellees have already, in another action, recovered a judgment against the appellant company for a large amount, to compensate them for all damages suffered by reason of the delay in shipment complained of here, and that judgment has been affirmed by this court.   But the mere fact that the company has wrongfully failed to furnish cars to appellees does not necessarily entitle them to a penalty in addition to their damages." If our contention that the statute under consideration was intended as a cumulative

remedy be correct, it is obvious that the above could only be considered as a mere "begging of the question." This question must be decided, and the truth is, it was decided in the first instance, without regard to whether or not the appellees had recovered judgment by way of damages for failing to furnish cars in another action; for, when the judges passed upon and decided the present cause, it was unknown to them that another case was pending here on appeal from a judgment for damages for failing to furnish cars.

The object of the statute is not to enforce the same facilities or equality in facilities, but to prohibit *unjust or undue inequality*, We think these qualifying words "undue or unjust" have either been overlooked, or have not been given the significance which their use in the statute requires. Many of the instances mentioned as showing the impracticability of giving effect to the statute under the construction we contend for would be recognized at once by any man of good common sense, whether judge or juror, as not an unjust or undue discrimination. These words "unjust or undue" allow for all differences in the situation and circumstances of shippers and railway companies, whether at the same or different stations. They furnish a wholesome restriction and safe limitation to the passion or caprice of jurors; and, within these bounds it would not be difficult, much less impracticable, for trial judges, with proper directions, to hold jury verdicts. At any rate, the question of whether there has been an unjust or undue discrimination, like thousands of other mixed questions of fact, and law, must be left to the jury under proper instructions from the trial court. The fact of shippers being at different stations or localities is to be submitted to the jury along with every other fact in the determination of this question. But we insist that this fact being conceded or undisputed does not, of itself, justify the court in declaring as a matter of law that in such a case there can be no such thing as an undue or unjust discrimination. The statute is plain. "No unjust or undue discrimination shall be made in charges for or in facilities for transportation of freight or passengers within the state."

No amount of subtle reasoning or lengthy argumentation can either obscure or make clearer the legislative intent to pro-

hibit acts of undue or unjust discrimination between the parties named "within the state." Under the construction given it by the court, the act is shorn of the very force and power which the legislature doubtless most designed it should have.

HUGHES, J., concurring.